UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

|  |  |  |
|---|---|---|
| IN re MIKOHN GAMING CORPORATION SECURITIES LITIGATION. | ) ) ) ) ) | 2:05-CV-01410-PMP-RJJ |
|  | ) | O R D E R |
| AND ALL RELATED ACTIONS. | ) ) ) | |

Presently before the Court is Defendants' Motion to Dismiss Amended Complaint and Memorandum of Points and Authorities in Support Thereof (Doc. #46), filed on May 30, 2006.  In conjunction with this motion, Defendants filed Defendants' Request for Judicial Notice in Support of Motion to Dismiss Amended Complaint (Doc. #47), and exhibits thereto (Doc. ##48-53).  On July 14, 2006, Plaintiffs filed Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss Amended Complaint (Doc. #58) and Plaintiffs' Response to Defendants' Request for Judicial Notice in Support of Motion to Dismiss (Doc. #57).  Plaintiffs also filed a Request for Judicial Notice (Doc. #59).  Defendants filed a Reply (Doc. #63) on August 14, 2006.

Also before the Court is Defendants' Motion to Strike Certain Paragraphs of the Amended Complaint and Memorandum of Points and Authorities in Support Thereof (Doc. #45), filed on May 30, 2006.  Plaintiffs filed Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Strike Certain Paragraphs of Amended Complaint (Doc. #56) on July 14, 2006.  Defendants filed a Reply (Doc. #64) on August 14, 2006.

///

1   **I.        BACKGROUND**

2          This is a securities class action on behalf of persons who purchased or otherwise

3   acquired securities of Mikohn Gaming Corporation, doing business as Progressive Gaming

4   Corporation ("PGIC"), between February 22, 2005 and October 19, 2005 (the "Class

5   Period").  (Am. Compl. [Doc. #44] at 1.)  Generally, Plaintiffs allege PGIC issued

6   materially false statements in connection with its acquisition of VirtGame Corporation

7   ("VirtGame").  (Id.)  The Lead Plaintiffs in this matter are individuals who either purchased

8   PGIC stock during the Class Period or individuals who received PGIC stock as part of the

9   VirtGame merger.  (Id. at 4-5.)

10          PGIC supplies integrated casino management systems software and games for the

11   gaming industry worldwide.  (Id. at 5.)  According to the Complaint, PGIC filed a

12   Registration Statement with the Securities and Exchange Commission ("SEC") on April 25,

13   2005, and amended the statement on June 3, June 28, August 1, and August 8, 2005.  (Id.)

14   The Registration Statement set forth the terms of a proposed stock-for-stock merger with

15   VirtGame in which PGIC would issue up to two million shares of common stock to be

16   exchanged for VirtGame's outstanding shares.  (Id. at 2.)  The proposed merger would

17   involve VirtGame merging with PGIC's wholly-owned subsidiary, Viking Acquisition Sub,

18   Inc., and then merging again with another PGIC wholly-owned subsidiary, Viking Merger

19   Subsidiary, LLC.  (Id.)  As part of this second merger, each outstanding share of VirtGame

20   common and preferred stock would be converted into PGIC common stock shares.  (Id.)

21          The Merger Agreement required the approval of both PGIC's board of directors

22   and VirtGame's shareholders.  (Id. at 7.)  PGIC's board of directors approved the merger on

23   February 14, 2005.  (Id.)  The August 8, 2005 Registration Statement provided a notice to

24   VirtGame shareholders of a special meeting to vote on the proposed merger and directed

25   VirtGame shareholders to review the Registration Statement for information on the

26   proposed merger.  (Id.)  VirtGame shareholders approved the merger on September 13,

1  2005, and the merger became effective on October 10, 2005.  (Id. at 4, 7.)  VirtGame

2  shareholders converted their stock to PGIC stock under the merger's terms.  (Id. at 4.)

3        The Complaint alleges that in addition to detailing the proposed merger, the

4  Registration Statement also purported to represent PGIC's present and historical financial

5  condition from 2000 through the first quarter of 2005, along with PGIC's accounting

6  policies.  (Id. at 2.)  According to the Complaint, PGIC artificially inflated its revenues and

7  other financial indicators because it did not follow its own internal accounting policies or

8  Generally Accepted Accounting Principles ("GAAP").  (Id. at 3.)  Specifically, the

9  Complaint alleges that the Registration Statement announced the issuance of Financial

10  Accounting Standards Board statement 153 ("FASB 153") in December 2004, which

11  amended a previous opinion providing that exchanges of nonmonetary assets should be

12  measured based on the exchanged assets' fair value, with certain exceptions.  (Id. at 8.)

13  FASB 153 eliminated the exception for nonmonetary exchanges of similar productive

14  assets, and instead provided a general exception for exchanges of nonmonetary assets that

15  do not have commercial substance.  (Id.)  A nonmonetary exchange has commercial

16  substance if the entity's future cash flow is expected to change significantly as a result of

17  the transaction.  (Id.)  FASB 153's new rule would apply to transactions after June 15,

18  2005.  (Id.)  The Complaint alleges that in the Registration Statement, PGIC stated it "does

19  not believe the adoption of [FASB] No. 153 will impact its financial statements."  (Id.)

20  However, an examination of the actual Registration Statement shows VirtGame, not PGIC,

21  stated it did not believe FASB 153 would have an effect on its financial statements.  (Defs.'

22  Request for Judicial Notice in Support of Mot. to Dismiss Am. Compl., Ex. B [Doc. #48-3]

23  at 14, Ex. C [Doc. #49-1] at 30, Ex. D [Doc. #50-3] at 10, Ex. E [Doc. #51-3] at 9, Ex. F

24  [Doc. #52-3] at 9; Pls.' Mem. of P. & A. in Opp'n to Defs.' Mot. to Dismiss Am. Compl.

25  [Doc. #58], Ex. 1 at 103.)

26  ///

3

The Registration Statement sets forth PGIC's historical financial data and incorporated PGIC's financial statements from 2000 to 2005.  (Id. at 9.)  According to the Complaint, the Registration Statement was false because it failed to disclose this financial data was inflated because PGIC booked revenues to which it was not entitled by counting revenues on sales for which customers refused delivery; understated reserves and carried accounts receivable balances it should have written off; failed to reverse goods and services for which PGIC over-billed customers; failed to disclose FASB 153's impact on PGIC's financial results, and recognized revenue on exchanges of patents and other nonmonetary assets to which it was not entitled in violation of GAAP.  (Id. at 10.)

According to the Complaint, PGIC represented during the Class Period that its financial statements were prepared in accordance with GAAP.  (Id. at 11.)  The Complaint alleges this statement was false because PGIC's statements did not comply with GAAP, specifically with APB 29, which advised companies to recognize a gain or loss on exchanges of nonmonetary assets.  (Id. at 13.)  The Complaint alleges PGIC engaged in nonmonetary exchanges, such as swapping patents or exchanging software licenses, without determining whether it incurred a loss or gain and recording the transaction as such in its income statements.  (Id. at 13.)  Instead, PGIC improperly recorded revenue from the transactions, failed to disclose the nature of the transactions in its financial statements, and did not explain the basis for its accounting of these transactions.  (Id. at 14.)

The Complaint further alleges PGIC ignored the potential impact of FASB 153's elimination of the exception from fair value measurement of nonmonetary asset exchanges for exchanges of similar productive assets.  (Id. at 14.)  According to the Complaint, FASB 153's changes were significant to PGIC because it earned forty percent of its revenue from licensing intellectual property, content and technology licensing transactions, which often took the form of nonmonetary exchanges.  (Id. at 15.)  Plaintiffs allege SEC Staff Accounting Bulletin No. 74 ("SAB 74") requires companies to disclose the potential effects

of recently promulgated accounting standards.  (Id. at 15.)  Plaintiffs further allege PGIC

failed to do so with respect to FASB 153, particularly with regard to two nonmonetary

exchanges in September 2005.  (Id. at 16.)

The first of these transactions involved PGIC's license of its legacy slot operating

system to a third party for six million dollars in exchange for intellectual property content

for use in PGIC's wagering growth initiative.  (Id.)  According to the Complaint, this

transaction accounted for eight percent of PGIC's total revenue for 2005.  (Id.)  The second

transaction involved obtaining the right to execute the license from the legacy slot operating

system owner in the first transaction for one and a half million dollars in exchange for PGIC

intellectual property.  (Id.)  PGIC did not disclose this arrangement until after the VirtGame

merger closed.  (Id.)  On October 20, 2005, PGIC issued a press release stating that rather

than reporting earnings of eight to ten cents per share for the third quarter of 2005, PGIC

would report a nine cent per share loss.  (Id.)  PGIC stock dropped twenty-nine percent over

the next day.  (Id. at 75.)  Based on these alleged violations, Plaintiffs assert violations of

Section 11 of the Securities Act (count one), Section 12(a)(2) of the Securities Act (count

two), and Section 15 of the Securities Act (count three).  (Id. at 21-24.)

The Complaint further details an alleged history of  accounting irregularities and

fraudulent practices at PGIC dating from 2001.  (Id. at 26-30.)  Such practices include

overstating revenues based on estimated but not yet received payments, altering the date on

a bill of lading to include revenues within a different quarter, and management advising the

former Chief Financial Officer ("CFO") that the company "had to break even."  (Id. at 26-

27.)  According to the Complaint, PGIC ultimately discharged Arthur Andersen as its

outside auditor, but had trouble locating a new auditor due to its previous disagreements

with Arthur Andersen regarding proper reporting in a Form 8-K filed with the SEC.  (Id. at

28-29.)  Additionally, the Complaint alleges PGIC regularly maintained balances that it

overbilled or that represented goods the buyer had returned.  (Id. at 30.)  Rather than reverse

or reduce the revenues, PGIC eventually would write off these receivables.  (Id.)  The Complaint alleges PGIC's fraudulent conduct led the Michigan Gaming Control Board to investigate PGIC's practices in 2002, and ultimately to issue fines and sanctions against PGIC in 2004.  (Id. at 30-31.)

Defendant Russell H. McMeekin ("McMeekin"), PGIC Chief Executive Officer, joined the company in June 2002.  (Id. at 26, 31.)  According to the Complaint, McMeekin was concerned with both revenue recognition and PGIC's stock price.  (Id. at 31-32.)  McMeekin allegedly attempted to get a former PGIC CFO to "fudge the numbers," and promised the CFO that he would fire another employee whom the CFO thought should be terminated if the CFO got PGIC a penny per share profit for the close of the fourth quarter of 2002.  (Id. at 32-33.)  The Complaint asserts the former CFO was "forced out . . . because he wouldn't play the game."  (Id. at 34.)  In January 2004, Defendant Michael A. Sicuro ("Sicuro") joined PGIC as its new CFO.  (Id. at 26, 34.)

According to the Complaint, improper revenue recognition continued under McMeekin and Sicuro.  (Id. at 35.)  For example, the Complaint alleges that in June 2004, PGIC recorded sales for products that were not installed contrary to revenue recognition policy, resulting in PGIC overstating revenue by over two million dollars and net income by over one million dollars.  (Id.)  Additionally, the Complaint alleges PGIC engaged in a series of transactions in which it improperly booked revenue to meet projections.  (Id. at 36.)  For example, PGIC granted a license to a company called ITS in exchange for royalty payments by ITS.  (Id.)  During this transaction, PGIC booked $400,000 in revenue but never received such a payment, and PGIC ultimately wrote off the receivable.  (Id.)

In 2005, the Michigan Board of Gaming allegedly contacted PGIC regarding "cooking the books."  (Id. at 40.)  The Michigan Board of Gaming also contacted the Public Company Accounting Oversight Board, a congressionally-created entity formed in the wake of the Enron scandal.  (Id.)  Additionally, Hasbro, Inc. filed a lawsuit in early 2005 against

PGIC relating to licensing of certain licenses, alleging PGIC miscalculated royalty payments and unjustly enriched itself by more than six million dollars.  (Id. at 41.)  The Complaint alleges that facing these difficulties, PGIC insiders were desperate to complete the VirtGame acquisition without revealing their accounting irregularities.  (Id. at 42.)  PGIC tied executive compensation with PGIC stock price, creating incentive for top PGIC executives to reach target levels.  (Id. at 42-45.)

On February 21, 2005, PGIC issued a press release announcing its financial results for fiscal year 2004.  (Id. at 49.)  In that release, PGIC reported earnings of one cent per share and made other positive comments on PGIC's recent performance compared to years past.  (Id. at 49-50.)  The press release also contained comments by both McMeekin and Sicuro suggesting expectations of future growth.  (Id. at 50-51.)  PGIC thereafter announced its intended acquisition of VirtGame, resulting in positive reaction from market analysts.  (Id. at 51-52.)  In March 2005, PGIC filed its annual Form 10-K with the SEC for fiscal year 2004.  (Id. at 52.)  The report detailed the VirtGame acquisition and indicated that failure to close the acquisition negatively could affect PGIC stock price.  (Id. at 52-54.)

Additionally, the Form 10-K stated PGIC's financial statements were prepared in accordance with GAAP.  (Id. at 54.)  The Form 10-K also disclosed two recently issued Financial Accounting Standards, but did not mention FASB 153 or its potential impact, even though the new guidance was issued in December 2004.  (Id. at 55.)  With respect to revenue recognition, the Form 10-K stated PGIC recognized revenue when it delivered the completed product.  (Id. at 56.)  Both McMeekin and Sicuro signed the Form 10-K, averring that it contained no material misstatements or omissions.  (Id. at 57-59.)

///

///

///

///

On April 25, 2005, PGIC filed a Form S-4 with the SEC in which VirtGame acknowledged FASB 153, but stated VirtGame "does not believe the adoption of [FASB] No. 153 will impact its financial statements."[1]  (Id. at 59-60.)  Plaintiffs allege PGIC's failure to disclose FASB 153's potential impact on PGIC's financial indicators was false or misleading because PGIC recognized revenue on patent swaps in violation of GAAP, failed to disclose FASB 153 would impact materially PGIC's financial results, issued false financial projections to the market, knew at the time the projections were based on revenue that could be derived only through improper accounting, and falsely claimed their financial statements were issued according to GAAP.  (Id. at 60.)

On May 4, 2005, PGIC announced first quarter 2005 results, stating revenues increased over eight percent from the prior year and estimating earnings per share to be from twenty-five to thirty-two cents for 2005.  (Id. at 61-62.)  PGIC subsequently released its Form 10-Q for the first quarter of 2005, which McMeekin and Sicuro signed.  (Id. at 62-63.)  This Form 10-Q also did not mention FASB 153.  (Id. at 64.)

On August 1, 2005, PGIC issued a press release announcing financial results for 2005's second quarter in which it raised projections for the remainder of 2005.  (Id. at 65-66.)  Among other statements regarding PGIC's positive financial outlook, Sicuro stated he expected earnings per share in the third quarter to be eight to ten cents.  (Id. at 67.)  During an August 2, 2005 conference call with analysts, Sicuro reiterated an expected earnings per share of eight to ten cents.  (Id. at 68-69.)  On August 9, 2005, PGIC filed a Form 10-Q for the period ending June 30, 2005.  (Id. at 70.)  Although FASB 153 had become effective by this point, the Form 10-Q made no reference to the guidance or its potential negative impacts on PGIC's financial indicators.  (Id.)

---

[1]  As noted previously, although Plaintiffs allege PGIC made this representation, the actual Registration Statement refers to VirtGame's opinion about FASB 153's impact on its financial statements, not PGIC.

On October 10, 2005, PGIC closed its acquisition of VirtGame.  (Id. at 73.)
Eight days later, PGIC revealed that because PGIC failed to account properly for two
nonmonetary transactions in accordance with FASB 153, PGIC expected to report a loss of
nine cents per share rather than the projected gain of eight to ten cents per share.  (Id. at 74-
75.)  PGIC's stock price fell twenty-nine percent the next day.  (Id. at 75.)  Subsequently,
PGIC announced that had two licensing transactions been included in PGIC's financial
results, it would have reported a nine cent per share earning.  (Id. at 78.)

In March 2006, PGIC announced its Form 10-K for the 2005 fiscal year would be
delayed as it reviewed two licensing transactions from the fourth quarter.  (Id.)  PGIC
subsequently issued a Form 10-Q/A in which it detailed the two transactions and how PGIC
recorded the nonmonetary exchanges in accordance with FASB 153.  (Id. at 79-80.)

Based on these allegations, Plaintiffs assert violations under the Section 10(b) of
the Exchange Act and Rule 10b-5 (count four) and Section 20(a) of the Exchange Act
(count five).  (Id. at 86-89.)  Plaintiffs request this action proceed as a class action, and seek
damages for Defendants' alleged wrongdoing.  (Id. at 90.)

**II.  MOTION TO DISMISS**

Defendants move to dismiss the Amended Complaint with prejudice, arguing the
Court should dismiss count one because it sounds in fraud but Plaintiffs have failed to plead
fraud with particularity.  Further, Defendants argue that even if the notice pleading standard
applies, count one fails to state a claim because disclosure regarding FASB 153 was not
mandatory and Defendants' failure to inform investors about FASB 153's possible future
effects is not a misstatement of historical fact.  Defendants argue the Court should dismiss
count two because Plaintiffs have failed to allege Defendants are direct sellers.  Defendants
contend count four is subject to dismissal because Plaintiffs have alleged only one false
statement and that statement is not false.  Defendants assert they were not required to
disclose the future impact of FASB 153's requirements for accounting for transactions into

which PGIC had not yet entered because PGIC could not have known what those impacts would be.  Defendants further argue Plaintiffs' other allegations of improper conduct are conclusory, lacking in necessary detail, refer to pre-Class Period events, or rely on insufficiently identified confidential sources.  Additionally, Defendants argue Plaintiffs have not alleged facts giving rise to a strong inference of scienter, and Defendants' statements were forward looking statements protected by the Private Securities Litigation Reform Act's ("PSLRA") Safe Harbor provision.  Finally, Defendants argue that because there are no underlying securities violations, the Court also must dismiss counts three and five.

Plaintiffs deny count one is grounded in fraud and contend they need not allege fraud to state a claim under Section 11, and therefore notice pleading is sufficient.  Additionally, Plaintiffs assert they have alleged the Registration Statement is misleading because it incorporated prior financial statements and these financial statements were not prepared in accordance with GAAP contrary to PGIC's representations.  Specifically, Plaintiffs argue PGIC improperly recognized revenue on uninstalled or returned sales and on nonmonetary exchanges in violation of APB 29, carried receivables it should have written down, and failed to disclose the impact of FASB 153.  With respect to count two, Plaintiffs contend Defendants were direct sellers because they solicited sales by signing the Registration Statement.

As to the Exchange Act claims, Plaintiffs argue the Amended Complaint alleges Defendants artificially inflated PGIC's financial results by improperly recognizing revenue, failing to timely write down receivables, improperly capitalizing maintenance costs, and failing to disclose FASB 153's potential impact.  Plaintiffs further contend the Amended Complaint provides sufficient detail as to dates, transactions, and amounts.  Additionally, Plaintiffs argue the Amended Complaint adequately describes the confidential sources and establishes scienter by alleging Defendants regularly engaged in accounting manipulations,

10

1    violated GAAP, fired honest personnel, and had motive and opportunity to commit fraud

2    due to incentive-based compensation.  Finally, Plaintiffs request leave to amend if the Court

3    dismisses the Amended Complaint.

4            In considering a motion to dismiss, "all well-pleaded allegations of material fact

5    are taken as true and construed in a light most favorable to the non-moving party." Wyler

6    Summit P'ship v. Turner Broad. Sys., Inc., 135 F.3d 658, 661 (9th Cir. 1998) (citation

7    omitted).  However, the Court does not necessarily assume the truth of legal conclusions

8    merely because they are cast in the form of factual allegations in the plaintiff's complaint.

9    See Clegg v. Cult Awareness Network, 18 F.3d 752, 754-55 (9th Cir. 1994).  There is a

10   strong presumption against dismissing an action for failure to state a claim.  See Gilligan v.

11   Jamco Dev. Corp., 108 F.3d 246, 249 (9th Cir. 1997) (citation omitted).  The issue is not

12   whether Plaintiff ultimately will prevail, but whether he may offer evidence in support of

13   his claims.  See id. at 249 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

14   Consequently, the Court may not grant a motion to dismiss for failure to state a claim

15   "unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his

16   claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see

17   also Hicks v. Small, 69 F.3d 967, 969 (9th Cir. 1995).

18           In ruling on a motion to dismiss, a  court may consider documents attached to the

19   complaint, documents incorporated by reference in the complaint, or matters of judicial

20   notice without converting the motion into one for summary judgment.  United States v.

21   Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).  Where the plaintiff refers extensively to a

22   document or the document forms the basis of the plaintiff's claim, the Court properly may

23   consider the document when ruling on a motion to dismiss, even if the plaintiff does not

24   attach the document to the complaint.  Id.  For example, where a complaint alleges stock

25   fraud based on SEC filings, the Court may consider those filings without converting a

26   motion to dismiss into a motion for summary judgment.  Id. (citing In re Silicon Graphics

Secs. Litig., 183 F.3d 970, 986 (9th Cir. 1999)).

The parties have requested the Court take judicial notice of certain PGIC filings with the SEC and other related documents.  Because the Amended Complaint alleges securities fraud based on these filings and the parties do not dispute their authenticity or admissibility with respect to the motion to dismiss, the Court will take judicial notice of all exhibits the parties have offered as to the exhibits' existence and authenticity, but not to the factual truth of any matters asserted therein.

**A.    Count One - Section 11 of the Securities Act and Count Four - Section 10(b) of the Exchange Act and Rule 10b-5**

### 1.  Standard of Pleading

The parties initially dispute which standard of pleading governs Plaintiffs' Amended Complaint.  Defendants argue that because Plaintiffs' allegations sound in fraud, Plaintiffs must plead all their claims with particularity under Federal Rule of Civil Procedure 9(b).  Plaintiffs argue their Securities Act claims are not based on fraud but on negligence and strict liability, and therefore those claims are subject only to Federal Rule of Civil Procedure 8's notice pleading requirement.

Section 10(b) of the Exchange Act of 1934 makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]"  15 U.S.C. § 78j(b).  Rule 10b-5, promulgated under the authority of Section 10(b), makes it unlawful for any person:

> [t]o employ any device, scheme, or artifice to defraud,  . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  To state a claim under Section 10(b) and Rule 10b-5, a plaintiff

must allege: (1) misrepresentation or omission; (2) of a material fact; (3) made with

scienter; (4) on which the plaintiff materially relied; and (5) that proximately caused the

alleged loss.  Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 946 (9th

Cir. 2005) (citing In re Daou Sys., Inc. Sec. Litig., 397 F.3d 704, 710 (9th Cir. 2005)).

Claims brought pursuant to the Section 10(b) of the Exchange Act and Rule 10(b)-5 are

subject to Federal Rule of Civil Procedure 9(b)'s particularity requirement.  In re Daou Sys.,

Inc., 411 F.3d at 1014.

Section 11 of the Securities Act of 1933 provides that if a registration statement

contains an untrue statement of material fact or omits a material fact, any person acquiring

such security may sue certain individuals, including every person who signed the

registration statement and every person who was a director of the entity issuing the

registration statement.  15 U.S.C. § 77k(a).  To establish a Section 11 claim, a plaintiff must

demonstrate "(1) that the registration statement contained an omission or misrepresentation,

and (2) that the omission or misrepresentation was material, that is, it would have misled a

reasonable investor about the nature of his or her investment."  Kaplan v. Rose, 49 F.3d

1363, 1371 (9th Cir. 1994).  Section 11 is aimed at assuring compliance with the Securities

Act's disclosure provisions "by imposing a stringent standard of liability on the parties who

play a direct role in a registered offering."  Herman & MacLean v. Huddleston, 459 U.S.

375, 381-82 (1983) (footnotes omitted).  To further this purpose, a plaintiff need not plead

or establish a defendant acted with scienter to state a prima facie Section 11 claim, as even

innocent or negligent material misstatements or omissions will subject a defendant to

liability under this section.  Id. at 382; Kaplan, 49 F.3d at 1371.

Because Section 11 claims do not require scienter, a plaintiff asserting such a

claim usually must plead only a short and plain statement setting forth his claim.  See Fed.

R. Civ. P. 8(a); In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 270 (3d Cir.

2006).  Although fraud is not a necessary element of a Section 11 claim, "a plaintiff may choose nonetheless to allege in the complaint that the defendant has engaged in fraudulent conduct."  Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103 (9th Cir. 2003).  If the plaintiff opts to plead his claim in this manner, the claim is grounded in fraud and must satisfy Federal Rule of Civil Procedure 9(b)'s particularity requirement.  Id. at 1103-04.  If a complaint alleges both Section 11 claims and other claims which sound in fraud, and the plaintiff alleges a "unified course of fraudulent conduct," the Section 11 claims also sound in fraud and must meet Rule 9(b)'s requirements.  Id. at 1104.  However, where fraud is not an essential element of the asserted claim and the plaintiff does not allege a unified course of conduct, but does allege some fraudulent and some non-fraudulent conduct, "only the allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements."  Id.  In this situation, "if particular averments of fraud are insufficiently pled under Rule 9(b), a district court should 'disregard' those averments, or 'strip' them from the claim," and then examine the remaining allegations to determine whether they state a claim.  Id. at 1105.

A complaint may aver fraud overtly or by alleging facts that necessarily constitute fraud even if the complaint does not specifically use the words "fraud" or "fraudulently."  Id. at 1105.  Further, a complaint's disclaimer that it is not alleging fraudulent conduct is not sufficient, by itself, to establish the allegations do not sound in fraud.  See Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 160 (3d Cir. 2004).  Rather, the court must examine the factual allegations to determine whether a particular claim sounds in fraud.  Id.

The Amended Complaint expressly disclaims that its Securities Act claims include allegations of knowledge, scienter, or fraud.  (Am. Compl. at ¶ 1.)  Further, the Amended Complaint states the Securities Act claims do not incorporate by reference or otherwise rely on the fraud-based allegations in the Amended Complaint's Exchange Act claims, but are grounded on strict liability and negligence.  (Id. at ¶¶ 3, 66, 68-69, 74, 81,

14

82.)  These disclaimers do not, of themselves, establish Plaintiffs' Section 11 claims do not sound in fraud.  Rather, the Court must examine Plaintiffs' actual allegations to determine whether Rule 9(b)'s particularity requirement applies.

The Amended Complaint alleges PGIC's financial indicators were "artificially inflated."  (Id. at ¶¶ 7, 10, 36.)  This allegation does not allege fraud.  Artificial inflation of financial data could have occurred without any particular mental state.  For example, the Amended Complaint alleges the artificial inflation was the result of "accounting misstatements and failures to follow GAAP."  (Id. at ¶ 36.)  Such failures could have occurred through negligence rather than through fraudulent intent.

However, the Amended Complaint alleges Defendants "fraudulently" failed to disclose FASB 153's potential effect on PGIC's financial indicators, despite knowing the new standard would go into effect and knowing PGIC gained substantial revenues in the past based on its booking of revenues from nonmonetary exchanges.  (Id. at ¶ 51.)  The Amended Complaint also alleges Defendants "purposely misled" investors by failing to disclose FASB 153's potential impacts, "which Defendants knew or recklessly disregarded."  (Id. at ¶ 55.)

Furthermore, although the Amended Complaint attempts to bifurcate its Securities Act and Exchange Act claims, the two sets of claims rely upon the same unified course of fraudulent conduct.  Both sets of claims rely upon the same class period, many of the same statements of financial condition, and the same theories of falsity, including the failure to follow GAAP, overstating revenues, engaging in nonmonetary exchanges for which it did not properly account, and failing to disclose FASB 153's potential impact on PGIC's financial indicators.  (Id. at ¶¶ 1, 24-25, 30, 36, 38-41, 44-51, 156, 162, 165, 175, 177-78, 183, 188-90, 195, 199, 211, 232.)  Accordingly, Plaintiffs have alleged a unified course of fraudulent conduct, and they therefore must plead both their Securities Act and Exchange Act claims with particularity under Rule 9(b).

1

2. Rule 9(b)

2  Under Rule 9(b), "the circumstances constituting fraud or mistake shall be stated

3  with particularity" in the complaint. Fed. R. Civ. P. 9(b). To satisfy Rule 9(b)'s

4  requirements, the complaint "'must set forth more than the neutral facts necessary to

5  identify the transaction.'" Yourish v. Cal. Amplifier, 191 F.3d 983, 993 (9th Cir. 1999)

6  (footnote omitted) (quoting In re GlenFed Sec. Litig., 42 F.3d 1541, 1545 (9th Cir. 1994)

7  (en banc)). The Ninth Circuit has defined "neutral facts" to mean the "'time, place, and

8  content of an alleged misrepresentation.'" Id. at 993 n.10 (quoting GlenFed, 42 F.3d at

9  1547-48). In addition to pleading these neutral facts, the plaintiff "'must set forth what is

10  false or misleading about a statement, and why it is false. In other words, the plaintiff must

11  set forth an explanation as to why the statement or omission complained of was false or

12  misleading.'" Id. (quoting GlenFed, 42 F.3d at 1548).

13  The Amended Complaint identifies three bases for material misrepresentations in

14  PGIC's Registration Statement. First, the Amended Complaint alleges Defendants engaged

15  in various forms of improper revenue recognition resulting in an overstatement of revenues

16  on PGIC's financial statements from 2000 to 2005. Although these allegations revolve

17  around incidents that occurred before the Class Period, the Amended Complaint alleges the

18  Registration Statement which PGIC filed within the Class Period incorporated PGIC's

19  financial statements from 2000 to 2005. (Am. Compl. at ¶ 35.) Second, the Amended

20  Complaint alleges the Registration Statement contained a material omission because

21  Defendants failed to inform investors about FASB 153's potential impact on PGIC's

22  financial indicators. Finally, the Amended Complaint alleges PGIC improperly booked

23  revenues on sales of products where customers refused delivery or PGIC did not install

24  products, understated reserves and carried accounts receivables balances after PGIC should

25  have written them off, and failed to reverse amounts for overbilling or returns.

26  ///

i.  Improper Revenue Recognition

The Amended Complaint identifies four examples of alleged improper revenue recognition:  (1) estimating revenues from slot fees not timely paid; (2) recording revenue from products not yet installed; (3) recording revenue from nonmonetary exchanges; and (4) capitalization of maintenance costs on slot machines.  With respect to the first category of alleged improper revenue recognition, the Amended Complaint identifies the time as November 2001 and the content as PGIC improperly estimating revenues based on the number of days casino customers had not yet timely paid their slot fees on "slot routes." (Am. Compl. at ¶ 94.)  The Amended Complaint further identifies the amount of overstatement as $450,000.  (Id.)  However, the Amended Complaint does not identify the "place" where PGIC made this overstatement, as it is not linked to any PGIC filing, financial statement, press release, or oral statement of revenues.  Further, although Plaintiffs allege this activity "overstated" PGIC's revenue, the Amended Complaint does not explain why PGIC's alleged conduct was false or misleading.  For example, the Amended Complaint contains no allegation that this method of accounting for revenues violated a particular GAAP standard or was contrary to PGIC's stated method of recognizing revenue on slot routes.  Accordingly, the Amended Complaint does not state this averment with the required particularity.

With respect to recording revenue from products not yet installed, the Amended Complaint identifies the time as June 2004 and the content as PGIC recording sales for products which were not installed, resulting in PGIC overstating revenue by approximately two million dollars and overstating net income by approximately one million dollars.  (Id. at ¶ 114.)  The Amended Complaint explains why these alleged overstatements were false, averring that accounting revenue recognition policy for product sales required contracts to be installed before PGIC could record revenue on that transaction yet PGIC recognized the revenue before installation.  (Id.)  However, the Amended Complaint does not identify what

17

products for which customers were not installed prior to revenue recognition and does not

detail in what document or statement PGIC overstated its income or revenues based on this

alleged conduct.  Accordingly, the Amended Complaint does not state this averment with

the required particularity.

The Amended Complaint also alleges PGIC improperly recorded revenue on

nomonetary exchanges as purportedly shown by PGIC's booking of revenue from the ITS

licensing agreement.  The Amended Complaint identifies the content of the alleged

misrepresentation by alleging PGIC booked $400,000 to revenue even though it never

received payment from a transaction in which PGIC granted a license to ITS in exchange

for royalty payments from ITS.  (Id. at ¶ 118.)  The Amended Complaint states why this is

false because PGIC never received such a payment yet recognized it as revenue.  (Id.)

However, the Amended Complaint does not identify when this occurred or in which

financial statements or other documents this alleged overstatement is reflected.

Accordingly, this averment fails to meet Rule 9(b)'s particularity requirement.

Finally, the Amended Complaint alleges PGIC improperly capitalized

maintenance costs for slot machines.  The Amended Complaint identifies the content of the

alleged misrepresentation that PGIC's slot revenues had been deteriorating, leaving PGIC

with many slot machines in a warehouse rather than on casino floors, and rather than write

down the assets, PGIC capitalized maintenance costs for the slot machines.  (Id. at ¶¶ 115-

17.)  According to the Amended Complaint, PGIC capitalized between $1,500 to $2,000 per

machine for approximately 500 to 1000 machines.  (Id.)  Although the Amended Complaint

states that as of 2005 PGIC had hundreds of machines in the warehouse, it does not identify

when PGIC allegedly engaged in the improper capitalization or in what documents or

statements the alleged overstatement of revenue occurred.  Further, the Amended Complaint

does not identify why this method of accounting resulted in a false statement, such as

identifying a GAAP or other standard which would not permit PGIC to account for

maintenance costs as it did.  This averment therefore fails to satisfy Rule 9(b)'s particularity requirement.

### ii.  FASB 153

The Amended Complaint alleges PGIC's Registration Statement contained a material omission because PGIC failed to inform investors about FASB 153's potential impact on PGIC's financial indicators.  According to the Amended Complaint, APB 29, which pre-dated FASB 153, precluded companies from booking revenue based on nonmonetary exchanges, instead requiring companies to disclose the nature of such transactions and to book gains or losses on them.  (Am. Compl. at ¶¶ 45-47.)  The Amended Complaint further alleges FASB 153 likewise precluded the recognition of revenue on nonmonetary exchanges, and changed only how to value such exchanges.  (Id. at ¶ 48.)

According to the Amended Complaint, rather than book gains or losses on nonmonetary exchanges, PGIC improperly recorded revenue on such exchanges and failed to disclose the nature of these transactions or the basis for its accounting of the transactions.  (Id. at ¶ 49.)  The Amended Complaint alleges PGIC failed to disclose FASB 153's potential impact on PGIC's financial indicators even though PGIC previously earned up to forty percent of its revenues from non-recurring licensing of intellectual property, content and technology licensing activities that often took the form of nonmonetary exchanges.  (Id. at ¶ 51.)  According to the Amended Complaint, $31.2 million of PGIC's reported $78.2 million in revenue for 2005 consisted of such non-recurring licensing transactions.  (Id.)  Plaintiffs thus contend the Registration Statement was fraudulent because SAB 74 required PGIC to disclose the potential impact of recently promulgated accounting standards which it did not do.  (Id. at ¶ 52.)  The Amended Complaint alleges that had PGIC disclosed FASB 153's potential impact on future revenues based on its past experience of booking a substantial portion of its revenues based on such exchanges, the market would have been able to assess PGIC's reported and future revenues more accurately, particularly with

respect to two such nonmonetary exchanges in September 2005.  (Id. at ¶ 53.)

The Amended Complaint identifies the time and place of the material omissions as the Class Period with specific dates for the Registration Statement and each of its amendments.  The Amended Complaint identifies the content of the alleged omission as PGIC's failure to disclose the potential impact of FASB 153 on PGIC's financial indicators, and the place as the Registration Statement and amendments thereto, as well as PGIC's financial statements incorporated by reference in the Registration Statement.  The Amended Complaint also explains why this is false, averring that SAB 74 required PGIC to disclose the potential impact of new accounting standards such as FASB 153 yet PGIC failed to do so despite PGIC's knowledge based on its past practice of booking substantial portions of its revenue through nonmonetary exchanges that alterations in how to account for nonmonetary exchanges might effect substantially its statement of revenues and other financial indicators.  This averment thus satisfies Rule 9(b)'s particularity requirement.

Defendants assail this particular allegation, however, contending that as a matter of law Defendants' alleged failure to disclose the unknown impact of a new accounting standard on future transactions is not a misstatement of historical fact.  Defendants assert SAB 74 did not require them to disclose potential impacts where the impacts are unknown, and the Amended Complaint contains no allegations that at the time PGIC issued its Registration Statement Defendants knew of the September 2005 transactions for which PGIC ultimately had to restate its projected earnings.  Defendants therefore argue the Amended Complaint fails to allege Defendants knew at the time PGIC filed the Registration Statement that FASB 153 would have any impact on PGIC's financial indicators, and thus the Registration Statement does not contain a material omission.

SAB 74 states that registrants should disclose all accounting standards which have been issued but not yet adopted by the registrant "unless the impact on its financial position and results of operations is not expected to be material."  (Defs.' Request for

Judicial Notice in Support of Mot. to Dismiss Am. Compl., Ex. J [Doc. #53-4] at 2.)  When

a disclosure is warranted, SAB 74 further states that although it "recognizes that the level of

information available to the registrant will differ with respect to various standards and from

one registrant to another," the disclosure should:

> (1) notify the reader of the disclosure documents that a standard has
> been issued which the registrant will be required to adopt in the future
> and (2) assist the reader in assessing the significance of the impact that
> the standard will have on the financial statements of the registrant
> when adopted.  The staff understands that the registrant will only be
> able to disclose information that is known.

(Id.)  SAB 74 then recommends registrants should consider disclosing the following:

> • A brief description of the new standard, the date that adoption is
> required and the date that the registrant plans to adopt, if earlier.
> • A discussion of the methods of adoption allowed by the standard and
> the method expected to be utilized by the registrant, if determined.
> • A discussion of the impact that adoption of the standard is expected
> to have on the financial statements of the registrant, unless not known
> or reasonably estimable.  In the [sic] case, a statement to that effect
> may be made.
> • Disclosure of the potential impact of other significant matters that
> the registrant believes might result from the adoption of the standard
> (such as technical violations of debt covenant agreements, planned or
> intended changes in business practices, etc.) is encouraged.

(Id. at 2-3.)

The Court cannot state as a matter of law Plaintiffs could prove no set of facts

showing SAB 74 required Defendants to disclose FASB 153's issuance and potential

impacts on PGIC's financial data.  The Amended Complaint alleges PGIC's practice of

booking revenue on nonmonetary exchanges in prior years accounted for a substantial

portion of PGIC's stated revenues.  Defendants allegedly therefore should have known

based on past practices that FASB 153's alteration of the method for measuring

nonmonetary exchanges had a potential impact on PGIC's future revenues, which PGIC did

not disclose.  Plaintiffs therefore assert PGIC's failure to disclose FASB 153's potential

impact, even if the disclosure consisted of little more than identifying the new standard and

stating the extent of its impact was unknown, was a material omission.  Plaintiffs state this claim with sufficient particularity to satisfy Rule 9(b).

iii.  Other Allegations

The Amended Complaint contains several other allegations of improper conduct, including that PGIC improperly booked revenue on product sales where customers refused delivery or PGIC did not install products; PGIC understated reserves and carried accounts receivables beyond the time PGIC should have written them off; and PGIC failed to reverse amounts for overbilled or returned goods and services.  (Am. Compl. at ¶¶ 95-96, 100, 114.) These claims are not supported by particularized allegations.  The Amended Complaint does not identify any specific instances of any of these alleged improprieties, and identifies no particular details with respect to time frame, products involved, customers involved, or the monetary affect these alleged activities had on PGIC's financial indicators.  The Amended Complaint therefore fails to state these allegations with particularity.

3.  Safe Harbor

Although Plaintiffs have alleged at least one underlying securities violation with sufficient particularity, Defendants contend that alleged omission was part of forward-looking statements for which the PSLRA provides safe harbor protection from liability. Plaintiffs respond that Defendants' statements are not subject to safe harbor protection because the statements were not coupled with meaningful cautionary language and Plaintiffs have alleged Defendants made the statements with actual knowledge they were false or misleading.

In an effort to prevent plaintiffs from claiming "fraud by hindsight," the PSLRA provides a "safe harbor" for "forward-looking" statements for both Securities Act and Exchange Act claims.  In re Daou Sys., Inc., 411 F.3d at 1021 (quotation omitted); see also 15 U.S.C. § 77z-2(c)(1)(B) (Securities Act); 15 U.S.C. § 78u-5(c)(1)(B) (Exchange Act).  A defendant's forward-looking statement will not subject him to liability if (1) he identifies

the statement as forward looking and accompanies the statement with meaningful

cautionary language; or (2) if the plaintiff fails to prove that the defendant made the forward

looking statement with actual knowledge that it was false or misleading.  15 U.S.C.

§§ 77z-2(c)(1), 78u-5(c)(1).

The only allegation Plaintiffs have pled with sufficient particularity under Rule

9(b) concerns Defendants' failure to disclose FASB 153's potential impacts on PGIC's

financial indicators rendering Defendants' statements regarding future expected revenues

and earnings per share misleading by material omission.  Because a prediction as to how a

new accounting standard may apply to future financial statements and predicted future

revenues and earnings per share involve forward looking statements, Defendants' alleged

material omission may be subject to safe harbor protection under the PSLRA.

### i.  Cautionary Language

The Registration Statement contains language warning of the risks inherent in

PGIC's business and makes specific reference to risks involved with the VirtGame merger.

(Defs.' Mot. to Dismiss Am. Compl. & Mem. of P. & A. in Support Thereof [Doc. #46],

App. of Cautionary Statements.)  The cautionary statements in PGIC's various filings and

during a conference call advise about a variety of risk factors, including delay in

introducing new products, PGIC's ability to enforce intellectual property rights, ability to

garner regulatory approval, customer acceptance of new products, economic conditions and

competitive pressures.  (Id.)

However, Plaintiffs allege Defendants omitted reference to a specific new

accounting standard, FASB 153, which potentially could impact up to forty percent of

PGIC's reported revenues based on PGIC's historic experience in revenue reporting based

on nonmonetary exchanges.  If, as Plaintiffs allege, Defendants knew PGIC's revenues

depended in substantial part on booking nonmonetary exchanges as revenue-generating

transactions which PGIC no longer would be able to do upon adopting FASB 153, general

23

cautionary statements about risks inherent in PGIC's business do not insulate statements

projecting revenues Defendants knew PGIC could not sustain without booking revenue

from nonmonetary transactions.  See In re Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d

1096, 1117-18 (D. Nev. 1998) (holding general cautionary statements about risks inherent

in construction project insufficient to grant safe harbor protection where plaintiffs alleged

defendants knew of specific cost overruns for which they gave no cautionary statement).

### ii.  Actual Knowledge

In addition to Rule 9(b)'s particularity requirement, the PSLRA heightens the

pleading burden for securities fraud plaintiffs by requiring them to plead scienter with

particularity.  Livid Holdings Ltd., 416 F.3d at 946 (citing 15 U.S.C. § 78u-4(b)(2)).  In

actions requiring the plaintiff to prove the defendant acted with a particular state of mind,

"with respect to each act or omission alleged to violate this chapter, [the plaintiff must]

state with particularity facts giving rise to a strong inference that the defendants acted with

the required state of mind."  15 U.S.C. § 78u-4(b)(2).  Accordingly, because the PSLRA's

safe harbor provision requires a plaintiff to prove a defendant acted with "actual

knowledge," the plaintiff must plead actual knowledge with particularity.  In re Vantive

Corp. Sec. Litig., 283 F.3d 1079, 1085 (9th Cir. 2002) ("Thus the complaint must allege

that the defendant made false or misleading statements either intentionally or with

deliberate recklessness or, if the challenged representation is a forward looking statement,

with 'actual knowledge . . . that the statement was false or misleading.'") (quoting 15

U.S.C. § 78u-5(c)(1)(B)(i)).  If the plaintiff fails to meet these requirements, the court must

dismiss the claim.  15 U.S.C. § 78u-4(b)(3).

By its terms, the PSLRA's heightened pleading standard for scienter applies only

to claims brought under the Exchange Act.  15 U.S.C. § 78u-(b)(2) (applying to private

actions "arising under this chapter . . . .").  The PSLRA's heightened pleading standard for

scienter does not apply to claims brought under the Securities Act of 1933.  Falkowski v.

24

Imation Corp., 309 F.3d 1123, 1133 (9th Cir. 2002), as amended by 320 F.3d 905 (2003). Accordingly, a plaintiff need plead a defendant's actual knowledge under the safe harbor provision only generally for a Securities Act claim.  See Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other condition of mind of a person may be averred generally.").

With respect to Plaintiffs' Section 11 claim under the Securities Act, Plaintiffs allege Defendants "knew or recklessly disregarded" FASB 153's potential impact on its future financial indicators and "knew at the time they issued their projections they were based on revenue that could only be derived from illegal patent swaps and improper accounting." (Id. at ¶¶ 55, 189, 211.)  The Amended Complaint also alleges that according to the former PGIC Assistant Controller, McMeekin and Sicuro were involved in the "patent swaps" and other large transactions, McMeekin and Sicuro had access to a "wide array of detailed accounting and financial information" which was "constantly available" to them, McMeekin had access to PGIC's accounting software program, and Defendants regularly participated in management meetings.  (Id. at ¶¶ 120, 143-44, 148-50.)  Finally, the Amended Complaint further alleges Defendant Sicuro "absolutely knew what was going on" with regards to revenue recognition for FASB 153.  (Id. at ¶ 152.)  Because Plaintiffs need allege knowledge only generally for purposes of their Securities Act claim, these allegations adequately plead knowledge.  The Court therefore will deny Defendants' motion to dismiss count one for failure to plead with the required particularity.

With respect to Plaintiffs' Section 10 and Rule 10-b5 claims under the Exchange Act, the Amended Complaint does not sufficiently allege with the requisite particularity that Defendants knew their failure to advise investors about FASB 153's issuance and potential effect on PGIC's financial indicators was actually false when made.  Plaintiffs allege Defendants "knew or recklessly disregarded" FASB 153's potential impact on its future financial indicators and "knew at the time they issued their projections they were based on revenue that could only be derived from illegal patent swaps and improper accounting."

(Id. at ¶¶ 55, 189, 211.)  These allegations are conclusory and give no factual basis in support.   The Amended Complaint also alleges that according to the former PGIC Assistant Controller, McMeekin and Sicuro were involved in the "patent swaps" and other large transactions.  (Id. at ¶ 120.)  The Amended Complaint does not allege the basis of this confidential informant's information regarding McMeekin and Sicuro's involvement in these transactions, however.  Further, McMeekin and Sicuro's involvement in closing a deal does not necessarily indicate they knew the transaction would be booked as revenue rather than as a gain or loss or that they thereby knew the effect FASB 153 would have on reporting such transactions in the future.

Next, the Amended Complaint alleges McMeekin and Sicuro had access to a "wide array of detailed accounting and financial information" which was "constantly available" to them, McMeekin had access to PGIC's accounting software program, and Defendants regularly participated in management meetings.  (Id. at ¶¶ 143-44, 148-50.) Although these allegations suggest Defendants may have had access to information which would have informed them on issues surrounding FASB 153, the Amended Complaint does not identify any specific report, statement, document, discussion, or meeting in which Defendants were provided with or expressed their familiarity with the fact that a substantial portion of PGIC's revenues were derived from nonmonetary exchanges or that FASB 153 may impact reporting of such revenues in the future.

The Amended Complaint further alleges Defendant Sicuro "absolutely knew what was going on" with regards to revenue recognition for FASB 153.  (Id. at ¶ 152.)  This allegation is based on the statement of a former PGIC Controller.  (Id.)  The allegation does not give a particularized factual basis for the PGIC Controller's statement that Sicuro knew "what was going on" with regards to FASB 153.  It does not identify or describe any conversation, meeting, report, or other indication supporting the Controller's statement as to what Sicuro knew and how he knew it.

The Amended Complaint contains no particularized allegations that Defendants had actual knowledge that failure to disclose issues surrounding FASB 153 was a material omission at the time Defendants issued the Registration Statement and made various projections regarding PGIC's future earnings per share and revenues.  The Court therefore will grant Defendants' motion to dismiss count four for failure to plead with the required particularity.

**B.    Count Two - Section 12(a)(2) of the Securities Act**

Defendants move to dismiss count two because the Amended Complaint fails to plead Defendants were "direct sellers" within this section's meaning.  Plaintiffs respond that by signing the Registration Statement, Defendants solicited sales within Section 12's meaning.

Section 12(a)(2) imposes civil liability on an individual who "offers or sells a security" by means of a prospectus or other communication containing a material misrepresentation or omission.  15 U.S.C. § 77l(a).  A person sells or offers to sell a security if he passes title of the security to the purchaser or solicits the sale of the security.  Pinter v. Dahl, 486 U.S. 622, 646-48 (1988).  A person who solicits the purchase within Section 12's meaning will be "motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  Id. at 647.  Merely signing a registration statement is "not enough by itself to establish the kind of relationship between plaintiff and defendant sufficient to establish statutory seller status" under Section 12.  In re Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d at 1120-21.

The Amended Complaint contains no allegations Defendants sold or offered to sell PGIC securities.  As this Court previously ruled in In re Stratosphere Corp. Securities Litigation, Defendants' act of signing the Registration Statement does not create the contractual relationship of purchaser and seller required to impose Section 12 liability.  The Amended Complaint therefore fails to allege a Section 12 claim.  The Court will grant

1   Defendants' motion to dismiss count two.

2   **C.   Count Three - Section 15 of the Securities Act and Count Five -**
3   **Section 20(a) of the Exchange Act**

4   Defendants move to dismiss counts three and five, arguing that liability under

5   Section 15 of the Securities Act and Section 20(a) of the Exchange Act does not exist

6   unless there is an underlying securities violation.  Defendants argue that because the

7   Amended Complaint fails to allege a securities violation, the Court should dismiss counts

8   three and five.  Plaintiffs respond that because they have stated securities violations, the

9   Court should not dismiss these counts.

10   Section 15 of the Securities Act provides joint and several liability for a person

11   who controls a person who violates § 77k or § 77l.  15 U.S.C. § 77o.  Similarly, to establish

12   a claim under section 20(a) of the Exchange Act, 15 U.S.C. § 78t, a plaintiff must allege:

13   (1) a primary violation of the Exchange Act or rules promulgated thereunder; and (2) the

14   defendant exercised control over the primary violator.  See Howard v. Everex Sys., Inc.,

15   228 F.3d 1057, 1065 (9th Cir. 2000); see also 15 U.S.C. § 78t.

16   Because the Amended Complaint states an underlying Securities Act violation

17   under § 77k in count one with sufficient particularity, the Court will deny Defendants'

18   motion to dismiss count three.  However, because the Complaint fails to allege an Exchange

19   Act violation with sufficient particularity, the Court will grant Defendants' motion to

20   dismiss count five.

21   **D.  Dismissal With or Without Prejudice**

22   Defendants request the Court dismiss with prejudice.  Plaintiffs request the Court

23   grant leave to amend should the Court dismiss any counts in the Amended Complaint.

24   Generally, a plaintiff may amend his or her complaint once "as a matter of course

25   at any time before a responsive pleading is served . . . ."  Fed. R. Civ. P. 15(a).  If a

26   responsive pleading has been filed, "a party may amend the party's pleading only by leave

of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a); see also Foman v. Davis, 371 U.S. 178, 182 (1962) ("Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded.").  In the Ninth Circuit, "[f]ive factors are frequently used to assess the propriety of a motion for leave to amend: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment[,] and (5) whether plaintiff has previously amended his complaint."  Allen v. City of Beverly Hills, 911 F.2d 367, 373 (9th Cir. 1990) (citing Ascon Props., Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir. 1989)).

The only basis Defendants offer for dismissal with prejudice is futility of amendment.  The Court cannot say as a matter of law Plaintiffs could not plead their allegations with sufficient particularity to overcome the particularity requirements in Rule 9(b) and the PSLRA.  Accordingly, dismissal without prejudice is appropriate.

**III.  MOTION TO STRIKE**

Defendants move to strike various paragraphs in the Amended Complaint, arguing some of Plaintiffs' allegations are irrelevant because they arise before the Class Period, they arise within the Class Period but are unrelated to the alleged misrepresentations or omissions at issue, or are scandalous.  Plaintiffs respond the pre-Class Period information is relevant because the Registration Statement incorporated PGIC's historic financial information and because it demonstrates PGIC's long-running pattern of engaging in fraudulent accounting practices.  Plaintiffs also argue the "scandalous" allegations often are direct quotes from Defendants themselves and relate to Plaintiffs' attempts to show Defendants' knowledge and intent.

///

///

///

1    Federal Rule of Civil Procedure 12(f) provides that the Court may strike from any

2    pleading "any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).

3    "Impertinent" means the statements "'do not pertain, and are not necessary to the issues in

4    question.'"  Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir. 1993) (quoting  5 Charles A.

5    Wright & Arthur R. Miller, Federal Practice and Procedure § 1382, at 711 (1990)), reversed on

6    other grounds 510 U.S. 517 (1994). "Scandalous" means the statement "'improperly casts a

7    derogatory light on someone, most typically on a party to the action.'"  Germaine Music v.

8    Universal Songs of Polygram, 275 F. Supp. 2d 1288, 1300 (D. Nev. 2003) (quoting 5A Charles

9    Alan Wright & Arthur R. Miller § 1382, at 712 (2d ed. 1990)).

10    The Court will not strike the pre-Class Period allegations as irrelevant because

11    PGIC incorporated by reference its prior financial statements in the Registration Statement

12    and thus the pre-Class Period allegations are not wholly immaterial to the matters at issue.

13    Additionally, the allegations regarding McMeekin and Sicuro do not improperly cast a

14    derogatory light sufficient to warrant striking the allegations regarding their alleged

15    comments or behavior.  The Court therefore will deny Defendants' motion to strike certain

16    paragraphs of the Amended Complaint.

17    ///

18    ///

19    ///

20    ///

21    ///

22    ///

23    ///

24    ///

25    ///

26    ///

**IV.      CONCLUSION**

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss Amended Complaint and Memorandum of Points and Authorities in Support Thereof (Doc. #46) is hereby GRANTED in part and DENIED in part.  Counts two, four, and five of the Amended Complaint (Doc. #44) are hereby DISMISSED without prejudice.  The motion is denied with respect to counts one and three.

IT IS FURTHER ORDERED that to the extent Plaintiff intends to reassert counts two, four and five of the Amended Complaint, Plaintiff shall file a Second Amended Complaint not later than October 16, 2006.

IT IS FURTHER ORDERED that Defendants' Motion to Strike Certain Paragraphs of the Amended Complaint and Memorandum of Points and Authorities in Support Thereof (Doc. #45) is hereby DENIED.


DATED:   August 31, 2006


                                                    _____
                                                    PHILIP M. PRO
                                                    Chief United States District Judge

31